UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

HENRY RODRIGUE, JR.   CASE NO.  6:20-CV-00032

VERSUS       JUDGE ROBERT R. SUMMERHAYS

PTS MANAGEMENT GROUP, LLC MAGISTRATE JUDGE WHITEHURST

## MEMORANDUM RULING

Pending before the court is a Motion for Summary Judgment filed by Defendant Berkshire Production Supply Co. LLC f/k/a Production Tool Supply Co. LLC ("PTS"). [ECF No. 21] PTS seeks dismissal of all claims against it. PTS has also filed Objections to Plaintiff's Exhibits Submitted in Opposition to Defendant's Motion for Summary Judgment. [ECF No. 33] For the following reasons, PTS objections are SUSTAINED in part and OVERRULED in part. PTS' summary judgment motion is GRANTED in part and DENIED in part.

## I.
### BACKGROUND

Rex Supply Company, a subsidiary of defendant PTS, hired Rodrigue as an outside sales consultant in March 2010. [ECF No. 29 at 6] Rex Supply sells tools and supplies to machine shops and Rodrigue was responsible for creating and maintaining customer accounts with machine shops throughout Southeast Louisiana. [*Id.*] During most of Rodrigue's tenure at Rex Supply, Tom Wright was his supervisor. Wright started with PTS as a Vice President in 2010, and his duties included supervising outside sales consultants. [*Id.* at 6] Wright eventually was named President of Rex Supply. [ECF No. 29-2 at 9] Rodrigue's sexual harassment claim is based on two incidents involving Wright.

1

The first incident allegedly occurred in March 2013 at a company retreat in Lafayette, Louisiana. [ECF No. 29 at 7] Rodrigue and other retreat participants were staying at the Lafayette DoubleTree Hotel. [ECF No. 29-1 at 12] In his deposition, Rodrigue testified that Wright and a customer (Tim Newton) were sitting at the hotel bar. [*Id.* at 12] Wright called to Rodrigue as he was walking through the hotel lobby and asked him to join Wright and Newton for a drink at the bar. [*Id.*] Rodrigue testified that he did not feel like drinking but replied that "I'm going to drink one and then I'm going to go up to my room." [*Id.*] Rodrigue testified that, after he was served a drink, Wright stood up and kissed him on the right side of his face near his mouth. [*Id.*] According to Rodrigue, the kiss "didn't quite touch my lip." [*Id.* at 16] Rodrigue testified that he turned around and the following exchange occurred:

> But one thing he did say when he -- like when I turned around, what got me so irate, when he was standing up -- when I -- when I turned around from facing the wall to face him, he said, **"There ain't nothing wrong with exploring your inner feelings sometimes,"** and that's when I -- I got angry. I gave him a look. Actually, my reaction was leaning back and that's why he kind of threw his hands up and said, **"Oh, no, no, no," and he says, "We've been drinking all day, we played golf, we got to go."** And I just watched them walk away.

[*Id.* at 13] (emphasis added). Rodrigue testified that "I remember saying to myself, 'Man, did he just ruin my career.' You know, I don't know how to explain it." [*Id.*] Wright, on the other hand, denies that he ever kissed Rodrigue.[1] Rodrigue did not file a complaint or otherwise report this incident until after the second incident in 2018. [ECF No. 29 at 10] Rodrigue explained that he did not report the first incident to PTS' human resources department out of fear that an HR complaint would adversely impact his career. [*Id.* at 8]

---

[1] Wright Declaration, Exhibit I to Defendants' Motion for Summary Judgment [ECF No. 21-10 at ¶¶ 5-6]. In his declaration, Wright states that "Rodrigue's allegation completely shocked me because I have never kissed a man and I am not homosexual or bi-sexual." [*Id.* at ¶ 5]. There is no testimony or witness statement in the record from Newton or anyone else who may have witnessed the incident.

Rodrigue testified that there were no further incidents of sexual harassment—verbal or physical—by Wright until 2018. [ECF No. 29-1 at 13-14] Rodrigue continued to work under Wright's supervision after the 2013 incident and, from 2013 to 2018, Rodrigue testified that he excelled as a PTS salesperson and received positive performance reviews. [ECF No. 29-4 at 1-3] He asserts that Wright interrupted a group meeting at a sales seminar to recognize Rodrigue's accomplishments during 2017. [*Id.*] Rodrigue further testified that Wright promised him a "six-figure salary" if Rodrigue could close a major sale with Hunting Energy Services, Inc. in New Iberia ("Hunting New Iberia"). [*Id.*] Rodrigue asserts that he "regularly outperformed many of [his] colleagues" for eight years and that, in light of his performance and to retain him, PTS modified his pay structure to a "guaranteed commission and an additional commission" in addition to salary. [ECF No. 29-4 at 1]

The second incident involving Wright occurred at a company retreat in March 2018 at the bar of the same hotel (the Lafayette DoubleTree Hotel) where the 2013 incident occurred. Rodrigue testified that he was "sitting in the lobby with Carl Murray, Jonathan Banks, a couple of guys—one guy from Kosto Steel and two guys from Lenox Bank Saw companies." [ECF No. 29-1 at 14] Wright was also present and, according to Rodrigue, Wright "could barely talk, barely walk he was so drunk." [*Id.*] Rodrigue explained that he was not feeling well because he had food lodged in his esophagus. [*Id.*] He decided to order a shot of alcohol from the bar to see if that would help. [*Id.*] Rodrigue then informed the group that he was "still hurting" and "may have to leave if this keeps hurting." [*Id.*] At this point, Rodrigue's summary judgment declaration and his deposition testimony characterize the ensuing incident differently. Rodrigue states in his declaration that "[w]hen I got up to leave, without consent, Mr. Wright entered my personal space and kissed me on both cheeks to say goodbye." [ECF No. 29-4 at ¶ 27] Rodrigue then left the bar

area, and before he could "fully depart the hotel lobby, Mr. Wright forced himself in front of [Rodrigue] and stated, 'It's all good' and kissed [him] directly in the area of [his] mouth." [*Id.* at ¶ 30] Rodrigue's deposition testimony appears to describe only one kiss and a response by Wright when Rodrigue stated that he could not go out to dinner with the group:

> [E]verybody turned away to leave except Tom Wright, he came back towards me. **And he shook my hand with his right hand, he says, "That's all right, Beaver. It's all good," and he jumped up and kissed me on the mouth, on the right side time**, and I just -- I jerked back, put my head down, and boy, he took off. And I look -- "Not again." Man, I just took off for the elevators and everything, you know. I was like "I got you," you know, "I got you on camera now."

[ECF No. 29-1 at 14] When asked to clarify the location of the kiss, Rodrigue testified that Wright touched the right corner of his mouth but it was not "a full frontal lip lock—kiss … on the lips." [*Id.* at 16] Rodrigue then left the lobby and there are no allegations or evidence of any further harassment—physical or verbal—by Wright toward Rodrigue.

As with the 2013 incident, Rodrigue did not immediately report Wright's March 2018 conduct to defendants PTS and Rex Supply, nor did he immediately file a formal complaint. Rodrigue testified that he secured a new agreement with Hunting New Iberia in April 2018.  [ECF No. 29 at 9] On April 26, 2018, Rodrigue sent an e-mail to Wright and Mitch Bair (PTS' Chief Executive Officer at the time) stating "[a]t the beginning of last year, you said [corporate] said that when [w]e got this agreement signed I would receive the [s]ix digit salary we always talked about." [ECF No. 21-8 at 2] At the time, Rodrigue's yearly earnings were approximately $66,000. [ECF No. 21 at 17] Wright responded to Rodrigue's e-mail, stating that "I did not promise you a six figure salary upon execution of the Hunting (New Iberia) vending contract or under any other parameters at any time or in any way." [ECF No. 21-9 at 2] Wright further added that Rodrigue's pay was "very much in line with the total sales and resulting gross profit the territory generates." [*Id.*] But Wright also acknowledged Rodrigue's efforts:

> We do appreciate the good and hard work you have done toward securing business with all the Hunting facilities and elsewhere in your territory. We do understand that your efforts were essential in securing the business at the plant in Houma, and subsequently in Houston and New Iberia.

[*Id.*]

In June 2018, Rodrigue filed a formal complaint with PTS' human resources department reporting the 2013 and 2018 incidents with Wright. [ECF No. 21 at 9] The e-mail Rodrigue sent to human resources alleged that he felt he was being treated unfairly and being retaliated against because he did not participate in Wright's sexual advances. [ECF No. 21-11 at 3] He also mentioned a phone call he received from Wright to discuss the e-mail exchange about Rodrigue's request for a raise. [*Id.*] The e-mailed complaint asserted sexual harassment and retaliation but did not explicitly seek an increase in Rodrigue's salary. [*Id.*]

Heather Hancock, the Human Resources Manager of Berkshire Production Supply LLC, investigated Rodrigue's complaint. [ECF No. 21-7 at 2] She spoke to Rodrigue about his alleged encounter with Wright and discussed his claim that he had been promised a "six-figure salary." [*Id.*] Wright was also replaced as Rodrigue's supervisor by another corporate officer, Dave Conger. [*Id.* at 5] As part of her investigation, Hancock reviewed Rodrigue's performance, his compensation relative to his performance, and compared these numbers to those of other PTS salespeople.[2] [*Id.* at 3-5] Hancock interviewed Rodrigue, Wright, and two other PTS employees who were present at the 2018 retreat, and allegedly found no evidence to corroborate Rodrigue's allegation that Wright sexually harassed him at the retreat. [*Id.* at 5] Hancock and Mitch Bair met with Rodrigue to discuss the results of her investigation, including her conclusion that Rodrigue's pay was more than he would have received under a traditional commission structure. [*Id.* at 5]

---

[2] Hancock further stated that only Bair could grant mid-year raises, suggesting she interpreted Rodrigue's sexual harassment complaint to also request a mid-year raise. [*Id.* at 6].

Starting in July 2018, Conger began to hold regular meetings with Rodrigue because, according to Conger, "Rodrigue had not made any sales to 44 of Rodrigue's assigned accounts and five accounts made up over 90% of Rodrigue's total sales." [ECF No. 21-3 at ¶ 3]. Rodrigue, however, testified that PTS attempted to undermine his work performance after he filed the complaint with human resources, and that the company's actions "made it impossible for [him] to succeed at his job." [ECF No. 29 at 10] Rodrigue alleges that PTS could control the prices of products sold to individual customers, and that the company tried to undermine him by increasing the price of products sold to his customers. [*Id.*] For example, Rodrigue alleges that PTS raised the prices on products Rodrigue had been selling to Hunting Energy Services, Inc. in Bourg, Louisiana ("Hunting Bourg"), and to Houma Valve Service in Houma, Louisiana, to the point that the customers bought the products from competitors. [ECF No. 29 at 10] Rodrigue states that he had been doing business with these companies for at least seven years. [*Id.*][3]

In October 2018, Rodrigue filed a formal complaint against PTS with the Louisiana Commission on Human Rights and the Equal Employment Opportunity Commission ("EEOC"). [*Id.* at 11] In that complaint, Rodrigue asserts sex discrimination and retaliation based on (1) the 2013 and 2018 incidents involving Wright at the Lafayette DoubleTree Hotel, (2) PTS' failure to honor Wright's promise of a six-figure salary,[4] (3) Rodrigue's failure to receive any salary increases for eight years, and (4) Rodrigue's loss of key sales accounts.  [ECF No. 21-14 at 2-3] Rodrigue asserts that he received his first negative performance review shortly after he filed the

---

[3] Richard Williams, the facility manufacturing manager for Hunting Bourg, states in a declaration that Rodrigue told him about the complaint that he filed with PTS and that PTS raised the cost of items it sold to Hunting Bourg not long after Rodrigue filed the complaint. ([ECF No. 29-5 at ¶¶ 11-13]). Hunting Bourg began purchasing products from one of PTS' competitors as a result of the price increases. [*Id.*] This declaration, however, is subject to an objection by PTS that is considered below.
[4] The EEOC charge alleges that Wright promised a raise in return for business with "the Trenchless Division (New Iberia)," which is not explained or addressed by either party. [ECF No. 21-14 at 2]

EEOC charge—in November 2018. [ECF No. 29-4 at 5] Rodrigue alleges that the company's retaliatory actions then "intensified." [ECF No. 29 at 11]

First, Rodrigue testified that PTS changed how it processed his restocking orders so that large orders were broken into multiple smaller orders. This change required him to make more trips to customer locations, increased the likelihood of customers running out of stock between his trips, and resulted in customer dissatisfaction when stock ran low. [ECF No. 29-1 at 26-27] Rodrigue testified that he also lost sales or vendor accounts after he filed the EEOC complaint— going from around eighty accounts before filing to twenty-seven afterward—and was unable to view his accounts on the computer system for "about three or four months" after he filed the complaint. [*Id*. at 11] Rodrigue testified that, in May 2019, he attempted to acquire a prospective customer and provided the necessary forms to Tom Wright through Dave Conger. [*Id.* at 29] While this process normally took three to four days, the forms were not returned to the potential customer for approximately two months, and PTS did not acquire the customer. [*Id.*] He testified PTS showed no interest in acquiring new clients in Rodrigue's area, and actively refused one customer's attempt to open an account with PTS through Rodrigue. [*Id.*] Conger also transferred several of Rodrigue's accounts to other employees from 2019 through 2020:

- "On June 24, 2019, I transferred Rodrigue's Hunting New Iberia account to Darrel Dore because Rodrigue lived one and one-half hours away from the Hunting New Iberia and Mr. Dore lived in the area;"

- "On September 19, 2019, one of Rodrigue's largest accounts, Veracity Machine LLC, requested we remove our materials from their shop and cancelled their relationship with the Company altogether because of Rodrigue's inadequate service level;" and

- "On March 24, 2020, I removed Rodrigue from the K&B Machine Works account … due to lack of sales."

[ECF No. 21-3 at ¶¶ 5-7]. Conger states that these accounts were removed from Rodrigue "solely for the benefit of the customer." [*Id.* at ¶¶ 8] Rodrigue asserts that the company's actions were

calculated to undermine his sales accounts and his job performance, and ultimately to provide PTS with grounds to "fabricate" poor performance reviews, place Rodrigue on a performance improvement plan, and to ultimately terminate him. [ECF No. 29 at 10]

Rodrigue filed suit against PTS in the 15th Judicial District Court for the Parish of Lafayette, asserting claims under the Louisiana Employment Discrimination Law ("LEDL"), La. R.S. 23:301, *et seq.* for discrimination based on gender and retaliation. [ECF No. 1-2 at 4-6] PTS removed the case to this Court based on diversity jurisdiction under 28 U.S.C. § 1332. [ECF No. 1] PTS seeks summary judgment on all of Rodrigue's claims.

## II.
### SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, discovery products on file, and affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The purpose of summary judgment is to pierce the pleadings, to assess the proof, and to determine whether there is a genuine need for trial. *See Matsushita Electric Industries v. Zenith Radio Corp*. 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment procedure is designed to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant bears the burden of persuasion at trial on a claim or defense addressed in the motion for summary judgment, the movant must establish that there is no genuine dispute of material fact as to those claims or defenses. To satisfy this burden, the movant must come forward with competent summary judgment evidence conclusively establishing that no reasonable trier of fact could find other than for the moving party. *See Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986). To avoid summary judgment, the non-movant must then come forward with evidence showing that there is a genuine dispute of material fact.

If the non-moving party has the burden of persuasion at trial with respect to an issue addressed in the motion for summary judgment, the moving party may satisfy its initial burden by either (1) demonstrating affirmatively that there is no triable issue of fact as to each element of the non-moving party's affirmative defenses or claims, or (2) "showing" that the non-moving party cannot present evidence sufficient to satisfy the essential elements of its defenses or claims and thus cannot meet its burden of persuasion at trial. *Celotex Corp.*, 477 U.S. at 324–326, 106 S. Ct. 2548. If the moving party makes a showing that there is "no evidence" to support the non-moving party's claims or defenses, the non-moving party must come forward with "substantial" evidence showing a genuine dispute of material fact with respect to each essential element of its affirmative defenses or claims. *Id.* Substantial evidence for purposes of defeating summary judgment is evidence sufficient to support a jury verdict in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–252, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). Under this standard, the non-movant cannot rely on unsupported assertions or arguments but must submit sufficiently probative evidence supporting its claims or defenses. Even if the burden shifts to the non-moving party, the movant still retains the ultimate burden of persuasion on the motion for summary judgment. *Celotex Corp.*, 477 U.S. at 330–331, 106 S. Ct. 2548.

In considering a summary judgment motion, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)(court must view all facts and evidence in the light most favorable to the non-moving party). "Credibility determinations are not part of the summary judgment analysis." *Quorum*

*Health Resources, L.L.C. v. Maverick County Hosp. Dist*., 308 F.3d 451, 458 (5th Cir. 2002). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)).

### III.
#### OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

Before addressing PTS' motion for summary judgment, the Court must address PTS' lengthy objections to the summary judgment evidence submitted by Rodrigue. [ECF No. 33 at 1]

#### 1.  Failure to Adequately Cite to Record.

PTS first argues that Rodrigue's citations to the summary judgment record do not comply with the requirements of Rule 56 of the Federal Rules of Civil Procedure. [ECF No. 33 at 3-4] Rule 56 provides that "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials …" Fed. R. Civ. P. 56(c)(1). Under this rule, a court's decision to grant or deny a motion for summary judgment is "largely controlled by what the parties presented;" if the record contains evidence that might show a dispute of material fact, a party must specifically identify it. *Hernandez v. Yellow Transp., Inc*., 670 F.3d 644, 651 (5th Cir. 2012) (citing *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir.1996)). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-W. Packaging Corp*., 602 F.3d 374, 379–80 (5th Cir. 2010) (citing *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003)); *Lumar v. Monsanto Co.*, 395 F. Supp. 3d

762, 775 (E.D. La. 2019), *aff'd*, 795 F. App'x 293 (5th Cir. 2020)(declining to consider a deposition which was attached but not referenced in an opposition to a summary judgment motion); *Houston v. Mississippi Dep't of Hum. Servs*., 131 F. Supp. 3d 598, 603 (S.D. Miss. 2015)(declining to sift through "excessive page ranges" cited by plaintiff, including one range of nearly one hundred pages); *Barrow v. Greenville Indep. Sch. Dist*., No. CIV.A. 3:00-CV-0913D, 2002 WL 628665, at *5 (N.D. Tex. Apr. 18, 2002) (holding that a citation to 253 pages of summary judgment evidence did not satisfy the non-movants duty to identify the relevant parts of the record).

PTS objects to Rodrigue's citations to pages 20-31, 36-47 and 87-88 of Rodrigue's deposition transcript on the grounds that they do not cite specific lines of testimony and therefore are impermissibly vague. [ECF No. 33 at 3] Rodrigue's transcript citations range from four pages to approximately forty-four pages.[5] The longer citation ranges generally cite to a complex narrative [ECF No. 29 at 7] or characterize "the majority of [Rodrigue's] career." [*Id.*] The remaining citations range up to sixteen pages. While Rodrigue could have been more precise in pointing the Court to the portions of the summary judgment record that support his Opposition, his citations are not so burdensome that the Court will refuse to consider the evidence that he cites. PTS' objection based on Rule 56(c) is OVERRULED.

## 2. Objection to Excerpt from Rodrigue's Deposition Testimony.

PTS makes a second objection to Rodrigue's reliance on page 87 of his deposition transcript on the ground that Rodrigue's "response was clearly not responsive to the question." [ECF No. 33 at 3] That is the entirety of PTS' explanation, and it does not cite the specific question

---

[5] Rodrigue cites to: Exhibit A (Deposition Transcript of Henry Rodrigue), pp. 20-31, 36-44, 45-48, and 85-87; Exhibit B (Deposition Transcript of Tom Wright), pp. 15, 18; and Exhibit C (Deposition Transcript of Mitch Bair), pp. 89-93; 95-96. The deposition transcripts filed into the record are in a condensed format, which means that there are four pages of the deposition transcript on each page of the exhibit. [ECF No. 29 at 5-10]

or response that is the basis of the objection. Presumably, PTS is referring to the last question on page 87 and Rodrigue's lengthy response to that question, which ends on page 91. The deposition transcript does not include an objection to or motion to strike Rodrigue's answer to this question as nonresponsive. Nor does the transcript reveal an obvious basis for the objection. Although Rodrigue's answer is lengthy, it identifies the accounts that Rodrigue alleges he lost after reporting Wright's harassment. [ECF No. 29-1 at 24-25] As such, it is directly relevant to Rodrigue's allegations that he lost accounts after reporting harassment by Wright.  Accordingly, PTS' second objection to Exhibit A is OVERRULED.

### 3.   Citations to Wright's Deposition Testimony.

PTS objects to Rodrigue's citation to pages 15 and 18 of Wright's deposition transcript, attached as Exhibit B to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Exhibit B"). [ECF No. 33 at 3-4] In these passages, Wright discusses his prior work history and job duties at PTS. [ECF No. 29-2 at 5-6] PTS asserts that this testimony is irrelevant. [ECF No. 33 at 4] Rodrigue does not address this objection but argues that it is unnecessary because the Court can perform "its own admissibility analysis." [ECF No. 36 at 1-3]

A fact is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Rodrigue appears to cite pages 15 and 18 of Wright's deposition transcript to show that Wright started working for PTS as Vice President in 2010 and that he managed outside sales consultants, including Rodrigue. [ECF No. 29 at 6] This testimony explains the workplace relationship between Rodrigue and Wright which, in turn, is relevant to Rodrigue's harassment claim. Accordingly, PTS' objection to the cited portions of Exhibit B is OVERRULED.

### 4.   Objections to Rodrigue's Sworn Declaration.

PTS also objects to the declaration submitted by Rodrigue in opposition to the motion for summary judgment. PTS argues that the declaration contradicts his deposition testimony, contains inadmissible hearsay, contains testimony that is not relevant to any claim or defense in this case, and does not demonstrate that Rodrigue had personal knowledge of some of the statements made in the declaration. [ECF No. 33 at 5-7]

PTS first argues that paragraph 3 of Rodrigue's sworn declaration contradicts his deposition testimony. [ECF No. 33 at 5] In that paragraph, Rodrigue asserts that he "regularly outperformed many of [his] colleagues" for eight years and that, because of his performance, PTS modified his pay structure to a "guaranteed commission and an additional commission." [ECF No. 29-4 at 1] PTS argues that these statements in the declaration contradict Rodrigue's deposition testimony that (1) he only received an additional commission once during his employment at PTS, and (2) PTS modified Rodrigue's pay to retain him after a competitor offered him a job in 2013. [ECF No. 33 at 5] PTS argues that Rodrigue's declaration and deposition testimony "cannot be reasonably reconciled." [*Id.*] The Court disagrees. It is not inconsistent for Rodrigue to allege that he regularly outperformed many of his colleagues at PTS, that PTS changed his pay structure to add the possibility of an additional commission in recognition of his performance and in order to retain him, that the additional commission only materialized once, and that his pay structure was only adjusted once. PTS' objection that Rodrigue's sworn declaration contradicts his deposition testimony is OVERRULED.

PTS next seeks exclusion of paragraphs 17, 21, and 30 of Rodrigue's declaration on the grounds that they contain inadmissible hearsay and no exception to the hearsay rule applies. [ECF No. 33 at 6] PTS asserts that these paragraphs contain Rodrigue's repetition of statements allegedly

made to him by Wright. [*Id.*] Hearsay is a statement that: (1) the declarant does not make while testifying at the current trial or hearing, and (2) a party offers in evidence to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801. Hearsay is not admissible unless it falls within one of the exceptions to the rule. Fed. R. Evid. 802.

In paragraph 17 of his declaration, Rodrigue asserts that Wright kissed him and told him "There is nothing wrong with exploring your inner feelings." [ECF No. 29-4 at 2] In paragraph 30, Rodrigue alleges that Wright blocked him from leaving the hotel bar, said "It's all good," and then kissed him. [ECF No. 29-4 at 3] Rodrigue does not offer Wright's statements for the truth of the matters asserted in the statements—that there is nothing wrong with exploring one's inner feelings or that "It's all good." Both statements were made at the time Wright allegedly kissed Rodrigue in 2013 and 2018, and Rodrigue offers the statements to show that Wright's conduct amounted to gender-based harassment and that Wright's actions were sexual in nature. In other words, the fact that Wright's statements were made in connection with the alleged physical contact and their effect on Rodrigue are what is probative; not the truth of the statements.

In paragraph 21, Rodrigue asserts that Wright promised him that Rodrigue would receive a "six-figure salary" if he secured an account with Hunting New Iberia. [ECF No. 29-4 at 3] Again, this statement is not being offered for the truth of the matter asserted in the statement. Rodrigue's position is that Wright made a promise to increase his salary if a future event occurred (obtaining the Hunting New Iberia account) and that Wright and the company ultimately did not honor that promise. The statement is offered to show that the promise was *communicated* to Rodrigue; the truth of the statement is irrelevant in this context. PTS' objections to the contents of paragraphs 17, 21 and 30 of Rodrigue's sworn declaration on the grounds that they contain inadmissible hearsay are OVERRULED.

PTS next seeks dismissal of paragraphs 11-19 of Rodrigue's declaration on the grounds that any evidence regarding the alleged 2013 kiss is irrelevant. [ECF No. 33 at 6] As PTS notes, claims under the LEDL are governed by the same analysis as that for claims under Title VII. *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007). For purposes of Title VII claims of discrimination, evidence of instances of discrimination for which claims are time-barred may be used as "background evidence in support of a timely claim." *Vann v. Mattress Firm, Inc.*, 626 F. App'x 522, 526 (5th Cir. 2015) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). PTS' objection on that ground is OVERRULED.

Finally, PTS argues that the Court should exclude paragraphs 3, 7, 20, 35, and 41 of Rodrigue's declaration on the grounds that the declaration does not show that Rodrigue had personal knowledge of the statements made in these paragraphs. [ECF No. 33 at 6-7] Rule 56(c)(4) of the Federal Rules of Civil Procedure requires that an affidavit or declaration submitted to support or oppose summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." While an affidavit or sworn declaration may state that it is based on personal knowledge, there is no requirement that an affiant or declarant affirmatively state the basis for their personal knowledge. *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005) (citations omitted). Whether a declarant has personal knowledge as to a declaration's contents can be reasonably inferred when the contents are within the declarant's "sphere of responsibility." *Campbell Harrison & Dagley, L.L.P. v. PBL Multi-Strategy Fund, L.P.*, 744 F. App'x 192, 198 (5th Cir. 2018) (citing *DIRECTV*, 420 F.3d at 530).

In paragraphs 3, 7, 20, 35, and 41, Rodrigue states that (1) he began working for PTS as a sales representative in March 2010; (2) from 2010 to 2018, he regularly outperformed many of his

sales representative colleagues, and earned guaranteed and additional commission as a result; (3) from 2013 to 2017, he excelled as a sales representative and received positive performance reviews; (4) the Hunting New Iberia contract he secured on behalf of PTS was anticipated to net approximately $700,000 annually for PTS; (5) PTS "fabricated" his performance reviews; and (6) PTS placed Rodrigue on a performance improvement plan. [ECF No. 29-4 at 1-4] All of these statements involve Rodrigue's performance of his sales duties and appear to fall within his "sphere of responsibility" as an outside sales consultant for PTS. Accordingly, PTS' objection that Rodrigue has not demonstrated the personal knowledge required to make these statements is OVERRULED.

### 5. Declarations of Richard Bergeron and Richard Williams.

Finally, PTS objects to the declarations of Richard Bergeron and Richard Williams cited in Rodrigue's Opposition to the Motion for Summary Judgment. With respect to Bergeron, PTS argues that Bergeron was not disclosed as a witness in Rodrigue's Rule 26(a) disclosures nor was he identified during discovery. [ECF No. 33 at 7] More importantly, Rodrigue neglected to file Bergeron's declaration with his Opposition. PTS argues that Williams, like Bergeron, was never disclosed. [*Id.*] Given that neither witness was disclosed in time for PTS to depose those witnesses during discovery, the Court SUSTAINS PTS' objection to these two declarations. The declarations will not be considered on summary judgment. *Mobile Telecommunications Techs., LLC v. Blackberry Corp.*, No. 3:12-CV-1652-M, 2016 WL 6271717, at *4 (N.D. Tex. May 6, 2016) (excluding proffered summary judgment evidence by individuals who were not disclosed prior to the filing of the motion for summary judgment).

### III.
#### MOTION FOR SUMMARY JUDGMENT

Rodrigue's Complaint asserts claims under La. R.S. 23:301, *et seq.* for "unlawful employment practices based on disparate treatment, discrimination, and harassment against Plaintiff because of his gender …." [ECF No. 1-2 at ¶ 21]. The Complaint also asserts a claim for retaliation: "Defendant, through its agents and managers, established and maintained a pattern and practice of discriminatory treatment towards Plaintiff after he complained about Mr. Wright's unwanted sexual advances." [*Id.* at ¶ 22]. PTS argues that it is entitled to summary judgment on Rodrigue's claims for constructive demotion or discharge, discrimination, hostile work environment, and retaliation. [ECF No. 21] In his Opposition to the Motion for Summary Judgment, Rodrigue characterizes his claims as claims for "sexual harassment/hostile work environment" and retaliation only. [ECF No. 29 at 13] Accordingly, Rodrigue appears to take the position that he does not assert a claim for constructive demotion/discharge or disparate treatment discrimination. To the extent he does attempt to assert these claims in the Complaint, the claims are DISMISSED.

### A.  Hostile Work Environment.

PTS first argues that it is entitled to summary judgment on Rodrigue's hostile work environment claims under LEDL. Like Title VII of the Civil Rights Act of 1964 ("Title VII"), LEDL proscribes discrimination "against any individual with respect to compensation, or terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." La. Stat. Ann. § 23:332; 42 U.S.C. § 200e-2(a)(1). Because LEDL's provisions overlap federal anti-discrimination protections under Title VII, courts generally look to federal jurisprudence developed under Title VII in applying LEDL. *See DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007); *Baker v. FedEx Ground Package System, Inc.*, 278 Fed.Appx. 322 (5th Cir.

2008). Sexual harassment is a form of prohibited sex discrimination under Title VII, and encompasses quid pro quo harassment and harassment that creates a hostile work environment. *Newbury v. City of Windcrest, Texas*, 991 F.3d 672, 675-76 (5th Cir. 2021) (citations omitted). An employee asserting a quid pro quo harassment claim must prove that they suffered a "tangible employment action" resulting from the "acceptance or rejection of [a] supervisor's alleged sexual harassment." *Id.* Rodrigue's sexual harassment claim does not appear to be based on allegations of quid pro quo harassment by Wright but, instead, allegations that Wright's actions created a hostile work environment. [ECF No. 29 at 13] Accordingly, the Court will analyze Rodrigue's claim under the jurisprudence governing hostile work environment claims.[6]

Where, as here, a plaintiff alleges a claim based on same-sex harassment, courts employ a two-step analysis based on the Supreme Court's decision in *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75 (1998). In *Oncale*, the Supreme Court extended the protection of Title VII to same-sex harassment. *Id.* at 79. The inference that verbal or physical harassment is *because of sex* is "easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex." *Id.* at 80. Accordingly, to establish same-sex harassment under Title VII, a plaintiff must "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discriminat[ion]* ... because of ... sex.' " *Id.* at 81 (emphasis in original). Based on *Oncale*, the Fifth Circuit has identified at least three ways that same-sex harassment can amount to discrimination on the basis of sex: (1) that the harasser allegedly made "explicit or implicit

---

[6] To the extent that Rodrigue is attempting to assert a quid pro quo claim, there is no evidence in the summary judgment record showing that Wright's rejection of a raise was tied in any way to the incidents at the DoubleTree Hotel Bar in 2013 and 2018.

proposals of sexual activity" and there is "credible evidence that the harasser was homosexual;" (2) the plaintiff can show that the harasser was "motivated by general hostility to the presence of [members of the same sex] in the workplace;" or (3) the plaintiff may "offer direct, comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *La Day v. Catalyst Tech., Inc*., 302 F.3d 474, 478 (5th Cir. 2002) (quoting *Oncale*, 523 U.S. at 80). The second step of the analysis focusses on whether the plaintiff has satisfied the traditional requirements for a sexual harassment claim under Title VII: "(1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on a protected characteristic; and (4) that the harassment affected a 'term, condition, or privilege' of employment." *Boh Bros.*, 731 F.3d at 453 (citing *Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 162–63 (5th Cir. 2007)).

### 1. Is There a Triable Issue that Wright's Conduct Was "Because of Sex"?

Starting with the first step of the analysis, Rodrigue's hostile work environment claim is based on the first type of actionable same-sex harassment—that Wright's actions were explicit or implicit proposals for sex and that Wright is homosexual. In *Cherry v. Shaw Coastal, Inc.*, the Fifth Circuit explained the type of evidence required for this type of same-sex harassment: "(1) evidence that the harasser 'intended to have some kind of sexual contact with the plaintiff rather than to merely humiliate him for reasons unrelated to sexual interest', or (2) evidence that the harasser 'made same-sex sexual advances to others, especially to other employees.' " 668 F.3d 182, 188 (5th Cir. 2012) (quoting *La Day*, 302 F.3d at 480).

Rodrigue cites the 2013 and 2018 encounters with Wright in the DoubleTree Hotel bar as the basis for his hostile work environment claim.[7] With respect to the 2013 encounter, Rodrigue points to his testimony that Wright kissed him "on the face" near but not on his mouth and that Wright stated "there ain't nothing wrong with exploring your inner feelings sometimes." [ECF No. 29-1 at 13] Rodrigue, however, testified that there were no further episodes of sexual harassment by Wright—verbal or physical—until 2018. [*Id.* at 14] The nature and context of Wright's actions do not create a triable issue that his actions toward Rodrigue were "because of sex." Wright's statement after the kiss contains no words or terms that can be reasonably construed as an express proposal for sex. Nor can his statement be construed as an implicit proposal for sex given the context of the encounter. Rodrigue testified that immediately after Wright made the statement about exploring his "inner feelings," Rodrigue gave Wright an angry look and Wright immediately "threw his hands up and said, 'oh, no, no, no,'" and said that "we've been drinking all day, we played golf, we got to go." [*Id.* at 12-13] This statement—uttered when Wright saw Rodrigue's angry reaction to Wright's first statement—not only does not support an inference that Wright sought a sexual encounter but instead that Wright seems to be conveying to Rodrigue that his words and actions were mere "horseplay"—"we've been drinking all day, we played golf, we've

---

[7] The prescriptive period for a hostile environment claim under LEDL is one year, which can be extended for up to six months pending review or investigation by the EEOC or Louisiana Commission on Human Rights. La. Stat. Ann. § 23:303(D). The 2013 encounter appears to fall outside the statute of limitations for a hostile work environment claim. PTS briefly references limitations in one sentence in a footnote of its Motion for Summary Judgment. [ECF No. 21 at 14 n.6] In that footnote, PTS simply states that the 2013 conduct is time-barred. Nevertheless, under the "continuing violation" doctrine, Rodrigue could base a claim on actions that fall outside the statute of limitations if he can demonstrate some connection between the 2013 encounter and the 2018 encounter. *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009) (to trigger this doctrine, "the plaintiff must demonstrate that the 'separate acts' are related, or else there is no single violation that encompasses the earlier acts," and "the violation must be continuing") The summary judgment record does not appear to include any evidence of such a connection. The incidents are separated by a five-year timespan and Rodrigue alleges no harassing conduct—verbal or physical—by Wright during this five-year period. The parties, however, have not adequately briefed the statute of limitations applicable to Rodrigue's claims or the applicability of the "continuing violation" doctrine. Accordingly, the Court will not address it here.

got to go"—and not sexual in nature. *See La Day*, 302 F.3d at 483 (holding that "reasonably foreseeable 'male-on-male horseplay' is not actionable.") (quoting *Oncale,* 523 U.S. at 81). Moreover, unlike *La Day* and *Oncale*, Wright's statements in connection with the 2013 kiss contain no sexually-charged language. Even when Wright's statements and the kiss on the cheek are viewed together, they do not support a reasonable inference that Wright was seeking sex or amount to "credible evidence that [Wright] is homosexual." *La Day*, 302 F.3d at 480.

With respect to the 2018 encounter, Rodrigue testified that Wright kissed him "on both cheeks to say goodbye" and then shortly after that Wright kissed him on the right corner of his mouth. [ECF No. 29-4 at 3] Rodrigue testified that Wright stated, "it's all good." [*Id.*] Rodrigue, however, also testified that it was not "a full-frontal lip lock—kiss…on the lips" and that Wright's full statement— "that's all right, Beaver. It's all good"—was uttered when Rodrigue indicated that he was feeling poorly and could not leave the hotel with the rest of the group to "go drinking." [ECF No. 29-1 at 14-16] Viewed in context, Wright's actions and words in the DoubleTree Hotel bar in 2018, like 2013, fall more in the category of the "male-on-male horseplay" that *Oncale* held was not actionable under Title VII. *Oncale*, 523 U.S. at 81.

The brief and isolated nature of the 2013 and 2018 encounters further undermines any inference that Wright's actions and words were an attempt to solicit sex. Based on Rodrigue's testimony, both encounters appeared to have lasted not much more than a minute and, according to Rodrigue, Wright made no other sexual advances during the five-year period from 2013 through 2018. Indeed, Rodrigue continued to work under Wright's supervision from 2013 to 2018 and he alleges that he excelled in his sales duties and received positive performance reviews during this time period. [ECF No. 29-4 at 1-3] Rodrigue also testified that Wright recognized Rodrigue's accomplishments in 2017 during a sales meeting. [*Id.*]

Finally, Rodrigue has not come forward with evidence that Wright "made same-sex sexual advances to others, especially to other employees." *La. Day,* 302 F.3d at 480. In *La. Day*, for example, the Plaintiff came forward with evidence that the harasser had made same-sex sexual advances—verbal and physical—to other employees. 302 F.3d at 477. The record here contains no such evidence.

Based on the summary judgment record, a reasonable juror could not find by a preponderance of the evidence that Wright made "explicit or implicit proposals of sexual activity nor has Rodrigue provided "creditable evidence that [Wright] was homosexual." *Oncale*, 523 U.S. at 80. It is clear that, if true, Wright's actions were humiliating and improper. However, as recognized by the Supreme Court in *Oncale*, same-sex harassment is only actionable if it amounts to discrimination "because of sex." *Id.* The summary judgement record simply does not permit a reasonable juror to find by a preponderance of the evidence that Wright's actions were "because of sex."

### 2. Did Wright's Alleged Harassment Affect a Term, Condition, or Privilege of Employment?

Sexual harassment affects a term, condition, or privilege of employment if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boh Bros.*, 731 F.3d at 453 (citing *Aryain v. Wal–Mart Stores of Tex., L.P.*, 534 F.3d 473, 479 (5th Cir. 2008)). Isolated incidents of harassment generally will not support a hostile work environment claim unless they are "extremely serious." *Ivey v. Brennan*, 770 F. App'x 661, 665 (5th Cir. 2019) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *see also Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 435

(5th Cir. 2005) (citing *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir.2001)).[8] The conduct complained of "must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Harvill*, 433 F.3d at 434 (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir.1999)). The offensive conduct must go beyond "[t]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788. Whether the alleged conduct creates a hostile or abusive work environment "requires a careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81. This enables "courts and juries to distinguish between simple teasing or roughhousing among members of the same sex" and conduct that is severely hostile or abusive. *Id.* This inquiry must also consider the totality of the circumstances, including "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *West v. City of Houston, Texas*, 960 F.3d 736, 742 (5th Cir. 2020); *Harvill*, 433 F.3d at 435.

Considering the totality of the circumstances, the conduct cited by Rodrigue as grounds for his hostile work environment claim cannot support a reasonable finding that this alleged harassment was "sufficiently severe or pervasive" that it altered the terms and conditions of Rodrigue's employment and created an abusive working environment. First, the harassment

---

[8] There is some confusion in the Fifth Circuit's case law on the "pervasive or serious" standard. Some Fifth Circuit panel opinions—and lower district court cases following those opinions—suggest that the standard is *conjunctive* in that the plaintiff must show that the relevant conduct is "pervasive *and* serious." *See Shepherd v. Comptroller of Public Accounts*, 168 F. 3d 871, 874 (5th Cir. 1999); *Hoskman v. Westward Communications*, 407 F.3d 317, 326 (5th Cir. 2001). In *Harvill*, a Fifth Circuit panel observed that this formulation is erroneous because, under Supreme Court precedent, the standard is *disjunctive*. 433 F.3d at 435. In other words, conduct can satisfy the standard for a hostile environment claim if it is pervasive *or* if it is isolated but "extremely serious." *Id.*

alleged by Rodrigue was not frequent. This conduct involves two isolated and brief encounters separated by a five-year period during which Rodrigue continued to work for the company. Rodrigue testified that these two brief encounters were the only instances of harassment by Wright. Cases where courts have found triable issues with respect the severity or pervasiveness of harassment generally involve cases of more extensive and recurrent harassment over a period of time. For example, in *Harvill*, the plaintiff alleged a pattern of harassment that lasted over seven months. 433 F.3d at 435. During this 7-month period, the plaintiff alleged that her supervisor:

> [G]rabbed her and kissed her on the cheek, popped rubber bands at her breasts, fondled her breasts "numerous times," patted her on her buttocks "numerous times," and came behind her and rubbed his body against her. At one point, Harvill estimated that Rogers touched her breasts or her buttocks perhaps as often as once a week—although she later stated that it may not have been as often as once a week. She also claims that on one occasion Rogers made comments to her about her sex life and her abilities in bed. Harvill stated that she protested *every time* Rogers touched her breasts and she also protested when Rogers would pat her buttocks." *Id*. at 435-36.

Similarly, in *La Day*, the plaintiff grounded his hostile work environment claim on multiple, frequent instances of harassment:

> In the first incident, Craft observed La Day sitting in a car with La Day's girlfriend and saw "passion marks" on La Day's neck. According to La Day and his girlfriend, Craft approached them and stated, "I see you got a girl. You know I'm jealous."

> On a later date, La Day alleges that Craft approached him from behind while he was bending down and fondled his anus. La Day described the contact as similar to "foreplay with a woman." La Day turned around immediately and told Craft not to touch him that way because "I don't play like that." Craft laughed and walked away. That same day, La Day reported the incident to his immediate supervisor. Later that day, Craft allegedly spit tobacco on La Day's hard hat and shirt, stating "this is what I think of you."

302 F.3d at 476; *see also Hartfield v. Pizza Inn, Inc.*, No. 02-0097, 2002 WL 31056595 at *3-4 (E.D. La. Sept. 13, 2002) (observing that sexual hostile environment cases decided by the Supreme Court have generally "involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiff's work environment.") (citing

*Oncale*, *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc., v. Ellerth*, 524 U.S. 742 (1998); *Harris v. Forklift Systems, Inc*., 510 U.S. 17 (1993); and *Meritor Sav. Bank. FSB v. Vinson*, 477 U.S. 57 (1986)). Here, Rodrigue's allegations do not support a reasonable finding that Wright's alleged harassment was frequent or pervasive.

Even if allegedly harassing conduct is not frequent or pervasive, isolated episodes of harassment can support a hostile environment claim if they are "extremely serious." This requirement reflects the touchstone for a hostile environment claim—that the conduct be sufficient to "alter the condition of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. Here, both incidents were brief and occurred five years apart. While Rodrigue alleges that Wright kissed him on the face and, in one instance, the kiss touched the corner of his lip, Rodrigue testified that Wright did not kiss him directly on the lips. [ECF No. 29-1 at 16] Rodrigue even characterized one of Wright's kisses to the cheek as a kiss "goodbye." [ECF No. 29-4 at 3] Wright's conduct, if proven, was uninvited, humiliating, and improper. But this is not the type of physically threatening, hostile, or otherwise sexually charged conduct that would unreasonably interfere with a reasonable employee's work performance or undermine that employee's opportunity to succeed in the workplace as required for a Title VII claim. *Shepherd*, 168 F.3d at 874 (sexual teasing and some touching over a period of two years was "not severe" because it was "not the type of extreme conduct that would prevent [the plaintiff] from succeeding in the workplace"). Indeed, the conduct alleged by Rodrigue appears to be less severe than the conduct at issue in *Paul v. Northrop Grumman Ship Sys*., 309 Fed. App'x 825 (5th Cir. 2009), where the court ruled that the relevant conduct was not so severe or pervasive that it created a hostile work environment. There, the plaintiff alleged that a co-worker:

> walked up to her until his chest was touching hers, thus "chesting up" to her breasts in a thirty-second confrontation. As Paul [the plaintiff] attempted to separate

> herself, he stared at her in a hostile and intimidating manner. Paul then walked away toward a narrow ship passageway, but Barattini followed her. He forced his way through the door ahead of her, and, in doing so, placed his hand on her stomach and ran his arm around her waist. As he squeezed past her in the passageway, he allegedly "rubbed his pelvic region across [her] hips and buttocks." According to Paul, the incident lasted a total of approximately a minute and a half, and occurred in the presence of another supervisor who did not intervene.

309 F. App'x at 826.

Finally, the summary judgment record does not support a reasonable finding that Wright's actions in 2013 and 2018 "unreasonably interfere[d] with [Rodrigue's] work performance." *West*, 960 F.3d at 742. Specifically, Rodrigue testified that he excelled in his work for PTS after the 2013 encounter with Wright and that he received positive performance reviews up until the point he reported Wright's conduct to the company. [ECF No. 29-4 at 1-5] Rodrigue also testified that Wright recognized Rodrigue's accomplishments during 2017. Moreover, PTS points to evidence that Rodrigue "was typically one of the highest paid salespeople in Texas and Louisiana" between 2010 and 2017. [ECF No. 29-1 at 1-3] Even after the 2018 encounter with Wright, Rodrigue successfully landed a new sales account and approached Wright about a raise by email. [ECF No. 21-8 at 2] Wright praised Rodrigue's performance in an email regarding the allegedly promised raise: "We do understand that your efforts were essential in securing the business at the plant in Houma, and subsequently in Houston and New Iberia." [ECF No. 21-9 at 2] While Wright denied that he ever promised Rodrigue a raise, the summary judgment record reflects no evidence tying that denial to the 2018 encounter at the DoubleTree Hotel bar.

In sum, the summary judgment record does not support a reasonable inference that the alleged harassment on which Rodrigue bases his hostile environment claim was so severe or pervasive that it altered the conditions of his employment and created an abusive working environment. Accordingly, a reasonable juror could not find, by a preponderance of the evidence,

in favor of Rodrigue on his hostile work environment claim. PTS' Motion for Summary Judgment is therefore GRANTED with respect to this claim.

### B. Retaliation.

PTS also moves for summary judgment on Rodrigue's retaliation claim. The Louisiana Whistleblower Statute ("LWS") creates a cause of action for certain retaliatory actions taken by an employer:

> An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
>
> (1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
>
> (2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
>
> (3) Objects to or refuses to participate in an employment act or practice that is in violation of law.

La. Stat. Ann. § 23:967. As with a claim under LEDL, courts generally look to case law construing the anti-retaliation provisions of Title VII in construing a claim under the LWS. 42 U.S.C. § 2000e-3(a). *Rayborn v. Bossier Par. Sch. Bd.*, 881 F.3d 409, 415 (5th Cir. 2018) (observing that "our precedent, and that of the Louisiana state courts, has consistently cited to Title VII standards in interpreting § 23:967"); *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 805 n.1 (5th Cir. 2007) (noting that "the standards governing both claims [under Title VII and § 23:967] are materially indistinguishable"). To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action." *Newbury*, 991 F.3d at 678 (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007)). If the plaintiff demonstrates a prima

facie case of retaliation, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action …[i]f the employer does so, the burden shifts back to the plaintiff to prove that the proffered reason is pretext for the discriminatory or retaliatory purpose." *Newbury*, 991 F.3d at 678. A plaintiff must rebut "each nondiscriminatory or nonretaliatory reason articulated by the employer." *Id.*

### 1. Rodrigue's Prima Facie Case.

PTS argues that Rodrigue has not come forward with evidence establishing any of the elements of a prima facie case for retaliation. PTS first argues that Rodrigue has not shown that he was engaged in a protected activity under Title VII. A "protected activity" under Title VII is defined as "opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." *Williams v. Recovery Sch. Dist.*, 859 F. Supp. 2d 824, 830–31 (E.D. La. 2012) (citing *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003)). Title VII thus covers two distinct types of protected activity: (1) opposition to any practice rendered unlawful by Title VII (the "opposition clause"), and (2) making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII (the "participation clause"). *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 274 (2009).

PTS contends that Rodrigue cannot proceed under the opposition clause because he did not oppose "an unlawful employment practice of the defendant." [ECF No. 21 at 18] (quoting *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1136 (5th Cir. 1981)). Rodrigue cannot make this showing, PTS argues, because PTS is entitled to summary judgment on Rodrigue's hostile work environment claim. [ECF No. 21 at 24-25] PTS is correct in that Rodrigue's allegations and summary judgment evidence do not create a triable issue on each of the essential

elements of his hostile work environment claim. Evidence that the plaintiff opposed the defendant's conduct, standing alone, does not satisfy the opposition clause. Rather, the clause "requires opposition *of a practice made unlawful by Title VII.*" *E.E.O.C. v. Rite Way Serv., Inc*., 819 F.3d 235, 240 (5th Cir. 2016) (emphasis in original).  However, as *Payne* makes clear, the standard is not whether the plaintiff can successfully state and support a Title VII claim but whether the plaintiff "*reasonably believes* the employment practice to be unlawful." *Id.* (citing *Payne*, 654 F.2d at 1137) (emphasis added). This "reasonable belief" standard acknowledges that there is "some zone of conduct that falls short of an actual violation but could be reasonably perceived to violate Title VII." *Id.* at 241. In other words, the fact that Rodrigue has not demonstrated a triable issue on all the essential elements of his hostile work environment claim does not preclude a finding that he had a reasonable belief that Wright's actions violated Title VII. Whether Rodrigue held such a reasonable belief turns on the nature of the conduct alleged to violate Title VII and the context in which Rodrigue opposed this conduct. *Taliaferro v. Lone Star Implementation & Elec. Corp.*, 693 F. App'x 307, 310–12 (5th Cir. 2017) (citing *Rite Way*, 819 F.3d at 242).

Here, there is a triable issue as to whether Rodrigue held a reasonable belief that Wright's actions during the 2018 encounter and his rejection of Rodrigue's request for a raise shortly after this encounter violated Title VII. Wright's alleged conduct during the 2018 incident—the two kisses on Rodrigue's face and the side of his mouth—involved physical contact that Rodrigue testified was upsetting and humiliating. Although this brief encounter does not rise to the level of a Title VII violation, it is more serious than other brief incidents that the Fifth Circuit has held are insufficient to support a reasonable belief that the conduct alleged violated Title VII. *See Satterwhite v. city of Houston*, 602 F. App'x 585, 586 (5th Cir. 2015) (no "reasonable belief" where a coworker stated "Heil Hitler" during a work meeting and the comment was not directed toward

any particular person); *Taliaferro*, 693 F. App'x at 311 (no "reasonable belief" where allegations were based on a single text-message exchange involving a sexually-orientated joke and "zero tolerance" policy language in the defendant's employee handbook). It is also more serious than the conduct alleged in *Long v. Eastfield College*, where the panel denied summary judgment on a Title VII retaliation claim. 88 F.3d 300, 305 (5th Cir. 1996). In *Eastfield College*, the plaintiff filed an internal complaint after a supervisor made a sexually offensive joke and alleged that her supervisor treated her differently from other employees after she filed her complaint. *Id.* at 309. The court concluded that the offensive joke was "exactly the type of mere offensive utterance which should not, by itself, support a claim for hostile work environment." *Id.* The court, however, concluded that the joke and the supervisor's reaction to the plaintiff's internal complaints were sufficient to create a triable issue on whether the plaintiff had a "reasonable belief" that a Title VII violation had occurred. *Id.* In the present case, Rodrigue testified that Wright's conduct included not only close physical contact but also that Wright refused to grant Rodrigue a raise shortly after the 2018 encounter. Considering this evidence together, the court concludes that Rodrigue has created a triable issue as to protected activity under the opposition clause.

PTS also argues that Rodrigue cannot satisfy the participation clause. According to PTS, Rodrigue's retaliation claim is based primarily on his allegation that he was refused a raise, and that this retaliatory action occurred *before* Rodrigue filed a formal charge with the EEOC. [ECF No. 21 at 24] PTS' argument in this regard is really an argument about causation, not whether Rodrigue engaged in a protected activity under the participation clause. The summary judgment record establishes that Rodrigue filed an EEOC charge, which commenced an EEOC proceeding. [ECF No. 21-14] Any retaliatory acts resulting from that charge satisfy the participation clause.

Accordingly, Rodrigue has satisfied the "protected action" requirement for stating a prima facie Title VII retaliation claim.

PTS next challenges whether there is any evidence that Rodrigue suffered an adverse employment action.  Unlike a Title VII discrimination claim, an adverse employment action for purposes of a retaliation claim "need not rise to the level of ultimate employment decisions." *Welsh v. Fort Bend Indep. Sch. Dist*., 941 F.3d 818, 827 (5th Cir. 2019).[9] The standard for an adverse employment action in the context of a retaliation claim is an employment action that is "materially adverse, such that it would dissuade a reasonable employee from making a discrimination complaint." *Newberry*, 991 F.3d at 678. Under this broader standard, Rodrigue's retaliation claim is not limited to PTS' compensation decisions or Rodrigue's ultimate termination in 2020—actions that are ultimate employment decisions. Specifically, Rodrigue alleges that after he reported Wright's conduct in April 2018 and filed an EEOC charge in October 2018, PTS retaliated against him in the following ways:

- After Rodrigue's complaint to PTS' human resources department, the company allegedly tried to undermine him by increasing the price of products sold to his customers leading to a loss of sales to his accounts, including Hunting Energy Services, Inc.; [ECF No. 29 at 10]

- As a result of the loss of sales, Rodrigue was placed on a performance improvement plan and, in July 2018, Conger began to hold regular meetings with Rodrigue; [ECF Nos. 29-4 at 4; 21-3 at 2-3]

- Rodrigue testified that, in November 2018, less than a month after filing his EEOC charge, he received his first negative performance review; [ECF No. 29 at 11]

---

[9] Some Fifth Circuit cases had held that the "ultimate employment decision" requirement for Title VII discrimination cases applies equally to Title VII retaliation cases. *See, e.g., Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 708 (5th Cir. 1997) (the adverse employment action required to support a Title VII retaliation claim is limited to "ultimate employment decisions," for example "hiring, granting leave, discharging, promoting, and compensating"). The Supreme Court abrogated this requirement for retaliation claims in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ("We conclude that Title VII's substantive provision and its antiretaliation provision are not coterminous… [and] therefore reject the standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision and that have limited actionable retaliation to so-called 'ultimate employment decisions.' ")

- Rodrigue testified that the company locked him out of computer system for "about three or four months" after he filed the EEOC complaint, rendering him was unable to view his accounts; [ECF No. 29-1 at 11]

- He testified that he also lost sales or vendor accounts after he filed the EEOC complaint— from approximately eighty accounts before filing to twenty-seven after the filing; [*Id.*]

- He testified that PTS changed how he processed restocking orders to break up large orders into multiple smaller orders. This required him to make more trips to customer locations, increased the likelihood of customers running out of stock between his trips, and resulted in customer dissatisfaction when stock ran low; [ECF No. 29-1 at 17]

- He testified PTS showed no interest in acquiring new clients in Rodrigue's area, and actively refused one customer's attempt to open an account with PTS through Rodrigue; [ECF No. 29-1 at 18, 24-25]

- PTS transferred several of Rodrigue's accounts to other employees from 2019 through 2020; [ECF Nos. 29-1 at 11;  21-3 at 2-3] (Conger declaration, Rodrigue depo?) and

- PTS ultimately terminated Rodrigue on April 9, 2020. [ECF No. 29-1 at 10]

A reasonable juror could find that these actions were materially adverse to Rodrigue such that they "would dissuade a reasonable employee from making a discrimination complaint." *Newberry*, 991 F.3d at 678.

Finally, PTS argues that Rodrigue has not satisfied the causation requirement of his prima facie case. A plaintiff asserting a Title VII retaliation claim must ultimately establish "but-for" causation. In other words, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *University of Texas Southwest Medical Center v. Nasser*, 570 U.S. 338, 362 – 63 (2013). The Fifth Circuit, however, has observed that "we have repeatedly held that the requirement of showing but-for causation applies in the final, pretext stage, rather than the prima facie stage." *Williams v. BRFHH Shreveport, L.L.C.,* 801 F. App'x 921, 924 – 26 (5th Cir. 2020) (citing *Garcia v. Professional Contract Services, Inc.*, 930 F. 3d 236, 243 (5th Cir. 2019)). At the prima facie stage, the causation standard is less stringent than

the strict "but-for" causation standard. *Id.* A plaintiff need not show that the protected activity was the sole cause for retaliation, only that the two are "are not completely unrelated." *Besser v. Texas Gen. Land Off.*, 834 F. App'x 876, 882 (5th Cir. 2020). The employee may prove this through direct or circumstantial evidence. *McCoy*, 492 F.3d at 556. At the prima facie stage, a plaintiff can establish causation by showing a temporal proximity between the protected activity and the adverse employment action alone. *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 578 (5th Cir. 2020), *as revised* (Aug. 14, 2020) (citations omitted). This temporal proximity must be "very close," and the Supreme Court has held that a period of three months is insufficient to show causation. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). The Fifth Circuit's jurisprudence suggests that two and one-half months is the longest period that can, without more, show causation for retaliation purposes. *Brown,* 969 F.3d 578 (noting that the court has held periods of six-and-a-half weeks, two months, and two-and-a-half months to be close enough to show a causal connection).

PTS argues that there is no causal link between Rodrigue's protected activity and the retaliatory actions allegedly taken by PTS. Specifically, PTS contends that the alleged adverse action took place "*before* Plaintiff engaged in the protected activity." [ECF No. 21] (emphasis in original). PTS' argument seems to focus only on Wright's rejection of Rodrigue's request for a raise shortly before filing his complaint with PTS' human resources department. PTS, however, ignores the many other adverse actions cited by Rodrigue. Two of these actions—Rodrigue's first poor performance review and his inability to access his computerized account files—allegedly occurred within the first few months after Rodrigue filed his October 2018 charge with the EEOC. [ECF Nos. 29 at 11, 29-1 at 11] This timeframe falls within the time period in which a plaintiff can rely on temporal proximity alone to establish causation. *Brown,* 969 F.3d 578.

However, the summary judgment record supports a reasonable inference of causation even without relying on temporal proximity. Specifically, Rodrigue testified that he excelled as a PTS salesperson from 2013 to 2018, and that his performance was reflected in positive performance reviews and recognition by Wright during a sales meeting. Wright rejected Rodrigue's request for a raise in 2018. However, he acknowledged Rodrigue's contribution, stating that the company appreciated "the good and hard work [he had] done toward securing business with all the Hunting facilities and elsewhere in [his] territory," and that his "efforts were essential in securing the business at the plant in Houma, and subsequently in Houston and New Iberia." [ECF No. 21-10 at 5] PTS also acknowledges that Rodrigue "was typically one of the highest paid salespeople in Texas and Louisiana" between 2010 and 2017. [ECF No. 21 at 8] After Rodrigue filed complaints with the company and the EEOC, however, PTS' view toward Rodrigue changed: he received a negative performance review, he was required to meet regularly with his new supervisor to monitor his performance, PTS allegedly made it more difficult for Rodrigue to service his accounts, PTS transferred accounts from Rodrigue to other employees, and he was ultimately terminated in April 2020. The fact that this change occurred shortly after Rodrigue reported Wright's actions and filed a complaint with the EEOC supports a reasonable inference that Rodrigue's protected activities were the "but-for" cause of the adverse employment actions taken by PTS.

## 2. PTS' Burden to Show a Nonretaliatory Reason for its Actions and Pretext.

Where, as here, the plaintiff successfully shows a prima facie case of retaliation under Title VII, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action …[i]f the employer does so, the burden shifts back to the plaintiff to prove that the proffered reason is pretext for the discriminatory or retaliatory purpose." *Newbury*, 991 F.3d at 678. A plaintiff must rebut "each nondiscriminatory or

nonretaliatory reason articulated by the employer." *Id.* Evidence that casts doubt on the truth or legitimacy of the proffered reasons for an adverse employment action can be used to show pretext. *Brown*, 969 F.3d at 578. Temporal proximity is relevant at the pretext stage but is insufficient, standing alone, to demonstrate that a proffered reason is pretextual. *Id.* at 579 (citing *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007)). At the pretext stage, temporal proximity is only "one of the elements in the entire calculation." *Strong*, 482 F.3d at 808 (citing *Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir.1992)(finding that the plaintiff proved retaliation by showing temporal proximity, a lack of disciplinary history throughout a nine-year employment, termination on the basis of incidents for which no evidence existed, and repeated harassment by a supervisor about an EEOC complaint)).

PTS offers legitimate, nonretaliatory reasons for *some* of the adverse employment actions cited by Rodrigue. PTS offers evidence that certain accounts were transferred from Rodrigue to other employees in 2019 and 2020 because of Rodrigue's failure to adequately service those accounts or their distance from Rodrigue's home. [ECF No. 21 at 18] PTS also points to reasons why Rodrigue was not entitled to a raise. [ECF No. 21 at 17] PTS, however, does not point to any legitimate, nonretaliatory reasons for the other adverse employment actions cited by Rodrigue, including the negative performance review he received shortly after filing his EEOC charge in 2018 and Rodrigue's testimony as to other actions taken by PTS that undermined his ability to perform his job. Accordingly, the nonretaliatory reasons cited by PTS are not sufficient to shift the burden back to Rodrigue.

However, even if these proffered reasons were sufficient to shift the burden to Rodrigue, the summary judgment record creates a triable issue as to whether these reasons were pretextual. The summary judgment record, viewed in the light most favorable to Rodrigue, shows a distinct

difference in how PTS treated Rodrigue and viewed his performance as an employee before and after he reported his encounters with Wright. This sharp change in Rodrigue's treatment would allow a reasonable juror to conclude that PTS alleged non-retaliatory reasons for its actions were mere pretext for a retaliatory animus.

In sum, a jury may ultimately find that the evidence does not support a retaliation claim in this case. The standard for summary judgment, however, requires the court to view Rodrigue's claim through the lens of whether a reasonable juror could find by a preponderance of the evidence that Rodrigue has satisfied each of the essential elements of a retaliation claim. The Court concludes that a reasonable juror could find in Rodrigue's favor on his retaliation claim. PTS' Motion for Summary Judgment is therefore DENIED with respect to Rodrigue's retaliation claim.

## IV.
### CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that PTS' objections to the summary judgment record [ECF No. 33] are SUSTAINED in part and OVERRULED in part. The objections to the declarations of Richard Bergeron and Richard Williams are SUSTAINED. In all other respects, the objections are OVERRULED.

IT IS FURTHER ORDERED that PTS' Motion for Summary Judgment [ECF No. 21] is GRANTED in part and DENIED in part. With respect to Rodrigue's claims for constructive demotion/discharge, disparate treatment discrimination, and hostile work environment under

LEDL, the Court GRANTS the Motion for Summary Judgment. Those claims are DISMISSED.

In all other respects, the motion is DENIED.

THUS DONE in Chambers on this 26th day of July, 2021.

**ROBERT R. SUMMERHAYS**
**UNITED STATES DISTRICT JUDGE**